**NATIONAL LABOR RELATIONS BOARD
v. STANDARD OIL CO. et al.**

No. 2188.

Circuit Court of Appeals, Tenth Circuit.

Nov. 11, 1941.

Rehearing Denied Jan. 12, 1942.

Leonard Appel, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Morris P. Glushien, David Findling, and William Strong, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Montgomery Dorsey, of Denver, Colo., and G. R. Hagens, of Casper, Wyo. (Buell F. Jones, of Chicago, Ill., on the brief), for respondent Standard Oil Co.

C. H. March, Jr., and Ray S. Fellows, of Tulsa, Okl. (Donald Campbell, of Tulsa, Okl., G. R. Hagens, of Casper, Wyo., and Guy H. Woodward, of Tulsa, Okl., on the brief), for respondent Stanolind Oil & Gas Co.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

The National Labor Relations Board[1] filed a petition for enforcement of its order against Standard Oil Company,[2] an Indiana corporation, and Stanolind Oil and Gas Company,[3] a Delaware corporation.

Standard has its principal offices in Chicago, Illinois, and Whiting, Indiana. It is engaged in refining and marketing petroleum and petroleum products. Together with its subsidiary and affiliated corporations, it constitutes an integrated oil company. Stanolind has its principal office in Tulsa, Oklahoma, and is one of Standard's two principal producing subsidiaries. Standard owns and operates a refinery at Casper, Wyoming.

Oil Workers International Union filed separate charges against Standard and Stanolind. The Board entered an order consolidating the cases and on January 12, 1938, filed its complaint against Standard and Stanolind charging that the former dominated and interfered with the formation and administration of Standard Employees Collective Bargaining Association[4] and that Stanolind dominated and interfered with the formation and administration of Stanolind Employees Collective

---

[1] Hereinafter called the Board.
[2] Hereinafter called Standard.
[3] Hereinafter called Stanolind.

[4] Hereinafter called the Standard Association.

Bargaining Association[5] contrary to the provisions of § 8(1) and (2) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 2).[6] Standard and Stanolind interposed their respective answers denying the alleged unfair labor practices. The Standard Association intervened and filed an answer in which it alleged that its membership embraced a majority of all the workers employed at the Standard refinery at Casper, and denied that it was dominated by Standard. Hearings were had and thereafter in September, 1938, an order was made transferring the proceedings to the Board and directing that no intermediate report issue. Thereafter, the Board found that Standard had dominated and interfered with the formation and administration of, and contributed to the support of the Standard Association, and that Stanolind had dominated and interfered with the formation and administration of, and contributed to the support of the Stanolind Association in violation of § 8(1) and (2) of the Act, and that Stanolind had maintained surveillance over the concerted activities of its employees in violation of § 8(1) of the Act.

The Board made appropriate orders requiring Standard and Stanolind to cease and desist from the practices, withdraw recognition from the Associations, disestablish them, and post appropriate notices. It further required Standard to cease and desist from giving effect to any contracts with the Standard Association.[7]

## The Standard Case

The record discloses these facts: In 1919, Standard established at its Casper plant an Employees' Representation Plan, known as Industrial Relations Plan.[8] The Plan operated under the supervision of Standard's Director of Industrial Relations and his assistants and through a Joint General Committee on Industrial Relations,[9] consisting of employee representatives elected annually in the several departments and natural divisions of the plant and an equal or lesser number of management representatives appointed by Standard.[10] Company officials and employees having the power to hire, discharge, or discipline were neither eligible to act as employee representatives nor qualified to vote. Any other employee who had been in the company's service for at least sixty days prior to the date fixed for nomination was entitled to vote for employee representatives. Any other employee who had been in the company's service for a period of one year immediately prior to nomination, who was 21 years of age or over, and an American citizen, was qualified for nomination and election as an employee representative. Elections were regularly conducted under the supervision of the Director of Industrial Relations on company time and property. All Plan expenses, including those incident to elections and for pay of employee representatives for time spent on Plan business, were borne by Standard. The Plan made no provision for dues or

---

[5] Hereinafter called the Stanolind Association.

[6] Hereinafter called the Act.

[7] The petition to enforce was filed in this court on August 23, 1940. Hearing in this court was delayed due to delay in filing designations of the portions of the record to be printed, and due to postponement of the printing of the record at the request of the parties, pending negotiations for settlement. As a result, the record was not printed until June 3, 1941.

[8] Hereinafter called the Plan.

[9] Hereinafter called the Joint Committee.

[10] The Plan set up a procedure for adjusting employees' grievances. It provided first, for a conference in person or through the regularly elected representative of the employee with the foreman, the superintendent of the department, and the Assistant Director of Industrial Relations. It provided should such conference not result in a satisfactory disposition of the matter within a reasonable time, the employee concerned through his representative, or the management through its representative might then require such matter to be referred to the Joint Committee or any appropriate subcommittee thereof. The Joint Committee was required to consider the matter with reasonable promptness at a regular or special meeting. It further provided should the Joint Committee fail to effect a satisfactory settlement, the matter should then be referred to the president of Standard, who should endeavor to adjust the same; should the president fail to effect a satisfactory disposition, it should then be considered at a conference between the president and the employee representatives; and should such conference fail to effect a satisfactory disposition, it should then be submitted to the Secretary of Labor, and that if the Secretary of Labor should find the employee had been unfairly dealt with, Standard would make such reparation as the Secretary of Labor might deem just.

for meetings of the body of employees. The Joint Committee met monthly and was presided over alternately by an employee and a management representative. The meetings were generally attended by the Assistant Director of Industrial Relations. Digests of minutes of the meetings reported by a stenographer of Standard were mimeographed by Standard and posted on plant bulletin boards. The Plan could only be amended by a two-thirds vote of employee representatives and the approval of the Director of Industrial Relations and Standard's board of directors.

When the Act was sustained by the Supreme Court on April 12, 1937, in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, Standard took steps to dissolve the Plan.

On April 26, 1937, a special meeting of the Joint Committee was called by Standard and a letter from Standard's president, Edward G. Seubert, was read. The letter was addressed to the employees of Standard. It stated that Standard, recognizing the right of employees to deal collectively with the management and desiring to maintain just and harmonious relations between employees and management, established the Plan which it felt would provide for fair collective bargaining; that Standard feels, and believes that the employees also feel, the Plan has been fair and beneficial; that Standard believes no coercion, influence, or persuasion had interfered with the selection by the employees of their representatives; that Standard has constantly asserted the right of representatives to speak fearlessly and the right of its employees to join or refuse to join any legitimate society, fraternity, labor union, or other organization; that it has affirmed its willingness to bargain with its employees by whatever method or plan they desire; that it adheres to those principles; that recent legislation sustained by the courts indicates that the present Plan will not be permitted to remain operative; that the principal legal objections seem to be that the Plan was originally proposed by Standard, that it appoints half the representatives, and that it bears the entire expense of the Plan; that the Standard, therefore, regretfully announces it has no other option than to discontinue bargaining through the Joint Committee; that the law prohibits Standard from dominating or interfering with the formation or administration of any employees' bargaining association; that it does not prohibit the employees from forming an organization or any association to deal with the management which they believe desirable; that any employee or group of employees is at liberty to propose and discuss with Standard any method or plan for collective bargaining, and management appears to have the right to discuss with such representatives such plan or modification thereof until an agreement is reached; that it is desirable that any plan adopted should be agreed to by a majority of all employees; that negotiations between employees and Standard concerning procedure for collective bargaining may be carried on during working hours without loss of time or pay; that when a plan of bargaining has been agreed upon, the management may confer with employees under the Plan during working hours without loss of time or pay to such employees; that the management is prohibited from contributing financial support to bargaining organizations of employees; that Standard terminates the operation of the Plan, but that past policies of the company will be adhered to. The Joint Committee was then dissolved. Copies of the letter were circulated and distributed among the employees and a notice was posted on the bulletin board and distributed to the employees advising that the Joint Committee had been dissolved and that fact became generally known among the employees.

After Seubert's letter was read to the Joint Committee, Osborn, Assistant Director of Industrial Relations, stated that the Act "was passed to meet a need over the nation, and was not designed to dispense with the Industrial Relations Plan of the Standard Oil Co. The Industrial Relations Plan was striving for the same ends for the employees of our company that the National Labor Act appears to desire for the employees over the nation."

Promptly upon dissolution of the Plan, specific instructions were issued by Glair, general manager of manufacturing, of Standard, instructing Beard, the manager at Casper, not to take part in any labor activities in any shape or manner and to treat all groups alike. Beard promptly instructed all his foremen and supervisors not to participate in any way in any matters affecting the organization of any labor union and forbade the circulation of petitions and solicitation of members on the plant.

On the afternoon of April 26, 1937, M. W. Sanders, a stenographer in the lubricating department, whose superior was Forbes, office manager, but who did not, as stated in the Board's brief, share the office of Forbes, but had an office in a different building, discussed the dissolution of the Plan with Osborn and Traylor, Assistant Director of Industrial Relations and Assistant Safety Director, respectively. Sanders, however, did not discuss with them an organization to take the place of the Plan. The following day, Sanders and Lytle, plant cashier, and Holstein, payroll clerk, undertook to draft petitions for a new organization. They discussed the subject matter of the petitions throughout the day. Lytle and Holstein drew up what they thought should go into the petitions and handed it to Sanders. He typed drafts of the petitions after his work day had ended, using materials and a typewriter belonging to Standard. The petitions state that Standard recognizes the rights of employees to deal collectively with the management; that it has constantly asserted the right of employees to join any legitimate society, fraternity, labor union, or other organization; has affirmed its willingness to bargain with its employees by whatever method or plan desired and has not changed or abandoned those principles; that the law prohibits the management from dominating or interfering with the formation or administration of any employees' bargaining association; that the law in no manner prohibits the employees from forming an organization or an association which they believe desirable through which to deal with the management; that any employee or group of employees is at liberty to select representatives to propose and discuss with the management any method or plan for collective bargaining. They ended with the statement, "Let's organize our own collective bargaining association. * * * If you desire to join such an organization please signify your wish by signing this statement below."

Sanders testified that he, Lytle, and Holstein, having learned the employees were going to hold a meeting, prepared the petitions of their own volition, in order that they might be presented to the employees who came to the meeting. Sanders took them to the meeting. No signatures had been affixed thereto.

The Standard Association[11] was conceived by John C. Zolnoski, a pumper and oil treater, not a clerical worker as stated in the Board's brief, and Morrison, Mullenix, and Briggs, employees in the operating department.

After the notice of the dissolution of the Joint Committee was posted on the bulletin board, Zolnoski discussed with other employees the question of forming a new organization. The discussions took place during the noon hour on the way to work and in part during working hours. A majority of those whom he contacted were in favor of an independent organization. After deciding to hold the meeting, Zolnoski and Morrison called on Manager Beard and requested the use of the Industrial Building as a place for holding the organizational meeting. Beard advised them that the Act prevented him from permitting them the use of the building for that purpose. Morrison then made arrangements for the use of the City Hall as a meeting place and notice was given of the meeting to be held at the City Hall, April 27, 1937. Approximately 150 employees, including members of Oil Workers' International Union, Local 230, a C. I. O. affiliate, attended the meeting.[12] Zolnoski was elected chairman of the meeting. The Board's brief states that Zolnoski made a speech in which he praised the Joint Committee and its accomplishments. This statement is not borne out by the record.

Ben Schirk was elected temporary secretary. Zolnoski stated the purpose of the meeting and that the employees had the opportunity to form a nonaffiliated labor organization. The petitions were presented, but at the suggestion of Milo Briggs, an employee, they were withdrawn. A motion was duly made and adopted for the appointment of a committee to draft by-laws. Zolnoski appointed a committee of seven, consisting of John Rendleman, from the combustion department, T. R. French, from the wax plant, Sid Morrison, from the mechanical department, John Lytle, from the accounting department, Elmer Rutherford, from the pipe department, Cy Perkins, from the steam stills, and John Lynch, a stillman. Fischer, a still helper, who had served as one of the employees' representatives and who was a member of Local 230, invited the members present to

---

[11] Hereinafter in the Standard Case called the Association.

[12] Four of the five employee representatives under the Plan were members of Local 230.

join Local 230. He undertook to answer questions respecting Local 230. He was interrupted by employee Ellms, but Zolnoski accorded Fischer the floor.

The committee on by-laws wrote to the Assistant Directors of Industrial Relations in other Standard plants and was told that Standard could not advise or assist it. It wrote to employees of other plants, obtained a copy of the by-laws of the Chicago, Burlington & Quincy Railroad employees, and examined the plans under operation at the Sinclair Refining Company and the Texas Company plants. It also employed an attorney. The committee, with the assistance of the attorney, prepared a set of by-laws. On May 4, 1937, a general meeting of about 100 employees was held at the City Hall and the by-laws prepared by the committee were presented. Certain amendments were made and they were then adopted.[13]

The by-laws state the purpose of the Association is to provide an organization for collective bargaining; that membership in the Association shall be open to any employee of Standard, except employees having power to employ, discharge, or discipline; and that in the event any member shall become a supervisor having the power to employ, discharge, or discipline, he shall immediately lose his voting power in the organization, and his office if he is an office holder. They provide for regular annual meetings of the Association for the purpose of electing officers to be held on the first Monday of March of each year and for regular meetings of the members on the first Monday of each month, and for special meetings called by the chairman of the board of directors, and that it shall be the duty of the chairman to call a special meeting whenever requested in writing so to do by one-third of the members in good standing. They further provide that at all regular and special meetings, all members in good standing shall be entitled to one vote; that the secretary shall give proper notice of all regular and special meetings; and that all elections and questions pertaining to policy shall be by secret ballot. They fur-

ther provide that the affairs of the Association shall be controlled and managed by a board of nine directors elected at the annual meeting, and that no person shall be elected a director who is not a member in good standing; that regular meetings of the board of directors shall be held monthly, and that special meetings may be called at any time by the chairman; that immediately after each annual election, the directors shall elect a chairman, vice-chairman, and secretary-treasurer; and that any officer or member of the board may be removed from office by a two-thirds vote of the members present at any regular meeting.

They further provide that the Association shall be financed by dues and membership fees; that the membership fee shall be $1· and the annual dues $2 payable in advance; that no member who is delinquent in the payment of his membership fees or dues shall be entitled to vote at any meeting or entitled to hold office in the Association or become a member of the board of directors; that no member shall be eligible for election as a director or representative who has not been a member in good standing for one year, an American citizen, and 21 years of age, except those duly elected for the first term.

They further provide that the by-laws may be amended or repealed or new by-laws adopted at any regular meeting.

They further provide that "Any policy, rule or regulation in effect at the termination of the * * * Plan, not in conflict with the Association's purpose, or policies, shall remain in force until changed by agreement."[14]

The third meeting of the Association was held May 7, 1937, at the courthouse. Nine directors were elected by secret ballot from 18 nominated, and a resolution was adopted requesting recognition of the Association as bargaining agent for its own members. Shortly thereafter, at the Association's request, such recognition was given by Standard. It should be observed, however, that this was not exclusive bargaining representation.

---

[13] This meeting was attended by certain supervisory and other employees of Stanolind who desired to learn what form of organization the Association was creating.

[14] The Plan, in addition to its provisions for bargaining, embraced safety and sanitation rules and regulations and provisions respecting vacations and like matters. It is manifest that the quoted provision was incorporated for the purpose of continuing these rules and regulations until they should be changed through future bargaining. They had no relation to the independence of the Association nor to bargaining or procedure therefor.

Negotiations for a working agreement were opened, but Standard advised the Association that before such an agreement could be entered into, it would have to represent a majority of the employees. The Association conducted a membership campaign. Local 230, which apparently had a small membership, also carried on a campaign for additional members. On June 24, 1937, the Association requested recognition as sole bargaining agent. It was unable to show its membership included a majority of the employees and the request was denied. The membership campaign continued. A representative of Local 230 complained to Beard that circulation of petitions and solicitation of members were being furtively carried on in the plant. He refused, on request of Beard, to divulge the names of persons engaged in this activity. Beard then posted notices on the bulletin board to the effect that no one should discuss labor relations matters on the plant during working hours.

Someone handed a petition for membership in the Association to Harry Astin, a blanket repairman. He worked under foreman Wiederhold. Astin laid the petition on his desk where some employees may have signed it. He testified that he may have asked someone to sign it but that he did not remember so doing. Astin had a small number of men working under him at different times but he was not a foreman and had no power to hire, discharge, or discipline. There was no evidence that Beard had knowledge of the action by Astin. Beard at all times observed a strict neutral attitude between the Association and Local 230 in their respective membership campaigns.

From time to time both the Association and Local 230 sought conferences with Beard. No request for a conference was ever denied but Beard was careful to warn the employees who called on him that he must not and would not in anywise interfere with their organizational activities, that he would not advise them nor discuss such matters with them and that he was and would remain neutral, and he at all times adhered to that policy.

In August, 1937, the Association claiming its membership embraced a majority of the employees, again asked for recognition as exclusive bargaining agent. A conference was arranged and stubs of membership cards and a certificate in the form of an affidavit signed by the president and secretary of the Association were presented. These established that the Association represented a majority and recognition was granted. Following this, four days of discussion ensued between the representatives of the Association and the management in an effort to agree upon the terms of a bargaining contract. An agreement was finally reached embracing proposals made by both sides and the contract was signed under date of September 9, 1937.

While the contrary is stated in the Board's brief, the testimony of the secretary of the Association was to the effect that the bargaining agreement and all subsequent agreements between the Association and Standard were submitted to and approved by a vote of the membership of the Association, and that the representatives of the Association acted in accordance with its direction and instructions.

The bargaining agreement provided that Standard recognized the Association as the exclusive bargaining agent for its employees at the Casper refinery with respect to wages, hours of employment, and working conditions; that nothing therein contained should abridge or conflict with the right of any individual employee or group of employees to present grievances to Standard, nor abridge or conflict with the right of employees to become members of the Association or any other labor organization.

It further provided that the agreement might be amended by mutual consent of the parties and should become effective upon ratification by the Association and Standard, and that it should remain in effect for a period of one year, and from year to year, after ratification, unless terminated by either party on thirty days' notice prior to September 9 of any year.[15]

---

[15] It further provides that the procedure in dealing with questions at issue shall be as follows:

"1. Questions upon which employees desire consideration shall be first referred by the employees to the representative of their division. The representative shall attempt to settle the question satisfactorily through conference with the department head or the supervisor designated by such department head. If the question is not satisfactorily adjusted in ten days, it may be referred to the Conference as hereinafter provided.

"2. A Conference shall be established consisting of not more than five (5) rep-

The bargaining contract did not fix the number of divisions nor designate the departments included in each division. Those matters were determined solely by the Association. The divisions fixed by the Association were substantially different from the divisions under the Plan. A short time after the procedural agreement was concluded, several agreements were arrived at through the bargaining procedure, were approved by the membership of the Association, and signed by Standard and the Association.

At the hearing, members of the Association testified that it was voluntarily organized; that Standard had never interfered with its administration; and that a majority of the employees wanted an independent union and did not wish to become affiliated with a national or international labor organization.

In the subsidiary findings the Board emphasizes the activities in the formation of the Association of John A. Lytle, cashier in the Casper office, Zolnoski, a pumper and oil treater, Schirk, a clerk in the purchasing department who became secretary of the bargaining association, Bud Miller, a combustion engineer, Holstein, payroll clerk, William Frerick, a pump house worker, Carpenter, a pumper, Ellms, a water tender, Miner, a pumper, and Sanders, a stenographer, none of whom had any supervisory authority.

A local labor organization may be the product of the right of the employees to self-organization and to collective bargaining "through representatives of their own choosing" guaranteed by § 7 of the Act, 29 U.S.C.A. § 157.

The Act guarantees to the employees the right to self-organization, to form or join a labor organization, and to bargain collectively through representatives of their own choosing. This freedom of choice embraces both local and affiliated organizations and where the employees freely choose a local organization, it is not either for the Board or us to say whether they chose wisely or otherwise.[16]

resentatives of the Association, and an equal or less number of representatives of the Company selected by the Management of the Casper Refinery.

"3. The Conference shall be held regularly once each month.

"4. By a written request to the secretaries of the Conference, representatives of the Association or of the Company who are members of the Conference may call a special meeting of the Conference, to be held within three (3) days after the date when such request is served. Each such request for a special meeting shall state the nature of the question or questions to be considered at the special meeting.

"5. The Conference shall arrange its own procedure for conducting regular or special meetings.

"6. The Association representatives and the Company representatives to the Conference shall each appoint a secretary. Accurate records shall be kept of all proceedings and shall be approved by said secretaries.

"7. The Conference shall have the right to appoint sub-committees for study of such questions as in its opinion require joint investigation.

"8. Not less than 5 working days in advance of each regular meeting, the representatives of the Association and of the Company who are members of the Conference, shall furnish the secretaries with a list of questions to be considered at the meeting.

"9. The representatives of the Association at any meeting of the Conference shall have the right to caucus at any time. Representatives of the Company similarly shall have the right to caucus at any time.

"10. The Conference shall give prompt attention to questions presented to it for consideration, and shall endeavor to settle such questions satisfactorily.

"11. An Agreement shall be drawn up to cover any question at issue which has been satisfactorily settled by the Conference. This agreement shall be submitted to the proper official of the Company and to the proper representative of the Association for signature.

"12. If the Conference is unable to settle a question at issue within the period of time covered by three regular meetings or within any extension of time mutually agreed upon, the question may be referred in writing to the President of the Company for consideration.

"13. If the question is not satisfactorily settled by the President within 30 days, either party may request the United States Department of Conciliation, through the Secretary of Labor, to assign a Commissioner of Conciliation to the case.

"14. The Association and the Company agree to cooperate fully with the Commissioner of Conciliation, and to accept and abide by his decision."

[16] National Labor Relations Board v.

■ Standard employees had the right to form the Association and to join the same immediately after the disestablishment of the Plan.[17]

■ "Company sponsorship and influence of an earlier organization does not affect a later one, provided there is a clear and complete cleavage between the two."[18]

■ Although the Plan was dominated by Standard that fact does not justify the inference that the Association was likewise dominated, where undisputed and reputable testimony is to the contrary.

■ Section 10(e) of the Act, 29 U.S.C.A. § 160(e), provides: "The findings of the Board as to the facts, if supported by evidence, shall be conclusive." This "means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' * * * It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."[19] When the evidence is consistent with either of two inconsistent hypotheses it establishes neither.[20]

The issue presented is whether there was substantial evidence that Standard dominated and interfered with the organization of the Association and contributed to its support. Standard contends the evidence established that the Association was voluntarily organized and freely selected as the bargaining representative of its members. The decision of the issue involves a determination not only whether the order shall be enforced against Standard, but also whether the Association, which, under the allegations of its answer and the testimony of its members, was voluntarily organized and freely chosen as the bargaining representative of a majority of the employees and was not dominated by Standard, shall continue to exist and act as such bargaining representative.

It is true that president Seubert's letter was couched in friendly terms. Nevertheless, it expressly recognized the right of the employees to join or refuse to join any legitimate labor union or other organization, expressed a willingness to bargain collectively with Standard's employees, stated that the employees had a right to form any organization they chose to act as their bargaining agent, that it was unlawful for Standard to dominate or interfere with the formation or administration of any employees' bargaining association, and that negotiations for collective bargaining could be carried on during working hours and without loss of time, but that the law prohibited Standard from contributing other financial support to a bargaining association of its employees, unequivocally declared that the Joint Committee was no longer lawful, and gave the principal reasons therefor, and expressly stated that the representation plan was terminated and could no longer function as an instrumentality for bargaining between Standard and its employees. The slate was wiped clean.

The statement made by Osborn following the reading of Seubert's letter could not

Newport News S. & D. D. Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219;

National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 587, 61 S.Ct. 358, 85 L.Ed. 368.

[17] Humble Oil & Refining Co. v. National Labor Relations Board, 5 Cir., 113 F.2d 85, 88;

National Labor Relations Board v. Brown Paper Mill Company, 5 Cir., 108 F.2d 867, 871;

Magnolia Petroleum Co. v. National Labor Relations Board, 5 Cir., 112 F.2d 545, 552.

[18] National Labor Relations Board v. Moore-Lowry Flour Mills Co., 10 Cir., 122 F.2d 419, 424.

[19] National Labor Relations Board v. Columbian E. & S. Co., 306 U.S. 292, 299, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660;

Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126;

Continental Oil Co. v. National Labor Relations Board, 10 Cir., 113 F.2d 473, 481.

[20] Nevada Consolidated Copper Corporation v. National Labor Relations Board, 10 Cir., 122 F.2d 587;

Bussmann Mfg. Co. v. National Labor Relations Board, 8 Cir., 111 F.2d 783, 787;

Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F.2d 100, 114;

Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720.

convey the idea that the Plan continued to be legal. He was referring broadly to the objectives of the Plan and the objectives of the Act.

While the initial organizational meeting was held on April 27, 1937, the employees in working out their new employees' organization proceeded deliberately. The by-laws were not adopted until May 4, 1937, officers and directors were not elected until May 7, 1937, and it was not until August 19, 1937, that a majority of the employees decided to join the Association and employ it as their bargaining representative. In the period that intervened, Standard maintained a neutral attitude and followed a hands off policy. The record is devoid of any proof that Standard from April 27 to August 19 in anywise encouraged membership in the Association or interfered with its management.

There was some evidence that Astin, who possessed some supervisory authority, but no power to hire, discharge, or discipline, solicited a few members for the Association on the plant during working hours. There was no evidence that Standard had knowledge thereof. Standard had instructed its officials and supervisory employees to refrain from any labor organization activity and to maintain a neutral attitude, had prohibited solicitation of membership on the plant during working hours, and had publicized that fact by notice on the bulletin board. This isolated act of Astin, neither authorized nor encouraged by Standard and in violation of its express instructions, ought not to be imputed to Standard [21] and affords no ground, we think, for the annihilation of a labor organization freely organized by the employees and freely chosen by a majority of them as their bargaining representative.[22]

The structure of the Plan and the structure of the Association were substantially different. Standard financed the Plan. The Association was financed by initiation fees and dues. The Plan was created and put into operation by Standard. The Association was a voluntary organization of employees governed by by-laws drafted and adopted by its members. The Joint Committee was a committee sponsored by Standard and governed by rules adopted by Standard. The Association was governed by a board of nine directors and a president, secretary, and other officers elected at large by the members of the Association through a secret ballot. Officers and directors of the Association were chosen at an annual meeting where all of its members had the right to vote. Employee representatives on the Joint Committee were chosen by the employees in divisions designated by Standard. Except for voting once a year, employees under the Plan took no part in the activities of the Joint Committee. The membership of the Association held annual and monthly meetings and had a voice in the negotiations of the bargaining agreement and all subsequent agreements between the Association and Standard. Every agreement entered into was first authorized by a vote of the membership of the Association. The Plan could be amended only by a two-thirds vote of the employee representatives and the approval of the Director of Industrial Relations and Standard's board of directors. The Association reserved the right to amend its by-laws by a vote of the members at any regular meeting.

The Association was a new organization and not a mere continuation of the old Plan in a revised form.

While the bargaining procedure agreed to between Standard and the Association had points of similarity with the bargaining procedure under the Plan, there were important differences. The bargaining agreement with the Association provided for bargaining representatives, for conferences between the bargaining representatives and department heads, and for conferences between the bargaining representatives and representatives of Stand-

[21] National Labor Relations Board v. Whittier Mills Co., 5 Cir., 111 F.2d 474, 479;

E. I. Du Pont De Nemours & Co. v. National Labor Relations Board, 4 Cir., 116 F.2d 388, 400;

Quaker State Oil Refg. Corp. v. National Labor Relations Board, 3 Cir., 119 F. 2d 631, 633.

[22] Humble Oil & Refg. Co. v. National Labor Relations Board, 5 Cir., 113 F.2d 85, 92;

E. I. Du Pont De Nemours & Co. v. National Labor Relations Board, 4 Cir., 116 F.2d 388;

National Labor Relations Board v. Mathieson A. Works, 4 Cir., 114 F.2d 796, 799;

Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F. 2d 100, 115.

ard, but the bargaining representatives of the Association were selected by it from divisions determined by it and designated by its resolution, and not by Standard; and the Association representatives acted pursuant to its instructions and directions and submitted all agreements to its membership for ratification or disapproval. Association representatives reserved the right to caucus and discuss questions independently in an atmosphere freed from any inhibitions which the presence of management might cause. The Association's representatives had their own secretary and kept their own minutes of the meetings. There was nothing unusual about the provisions for regular conferences between Standard and the bargaining representatives of the Association. Provisions for such regular conferences are not infrequently found in bargaining contracts between employers and affiliated labor organizations.

The bargaining agreement resulted from negotiations, and provisions insisted on by both sides were incorporated therein. It merely provided the mechanics for collective bargaining between Standard and its employees in an honest effort to agree upon wages, hours, and working conditions. Certainly, there can be no objection to the agreement for reference to the United States Department of Conciliation under the Secretary of Labor. That department is maintained for the purpose of conciliating disputes between employer and employee.

The employees who conceived the Association had no supervisory authority and were not representatives under the Plan. They first ascertained the sentiment of many of their fellow employees, and then called the initial meeting. The initial and subsequent meetings were held off Standard's premises and after working hours.

The by-laws were framed by nonsupervisory employees and were revised by the body of employees who attended the meeting of May 4. No one with supervisory authority had anything to do with the launching of the Association or the framing of the by-laws.

We are of the opinion that when the record is considered as a whole, the evidence not only fails to support the finding that Standard dominated and interfered with the formation and administration of the Association and contributed to its support, but affirmatively establishes that the Association was voluntarily organized by the employees, freely chosen by them as its bargaining representative, and represents the desire of a majority of the employees.

We accordingly conclude that the order as to Standard should not be enforced.

## The Stanolind Case

Standard owns 85.4 per cent of the outstanding shares of Stanolind. Stanolind owns or operates five oil-producing fields in Wyoming and one lying partly in Wyoming and partly in Montana. It operates pipe lines, gas compression plants, and refineries. Its operations are carried on in six states. It produces in Wyoming a daily average of 68,079 gallons of casinghead gasoline which it sells and delivers to Standard in Wyoming. It also produces and purchases in Wyoming a daily average of 17,156 barrels of crude oil, 78.8 per cent of which is sold and delivered to Standard in Wyoming. The crude oil and casinghead gasoline so purchased and received by Standard from Stanolind are manufactured into petroleum products in Wyoming, by Standard, and 60 per cent thereof is distributed to points in other states. Stanolind also produces in the LaBarge Field a daily average of 1,000 barrels of crude oil which it sells to another Standard subsidiary, Utah Oil Refining Company, and which is shipped by the latter company from Opal, Wyoming, to its refinery at Salt Lake City, Utah.

It seems plain to us that a labor dispute between Stanolind and its employees resulting in the cessation of its production would obstruct the flow of casinghead gasoline and crude oil to Standard and of crude oil to the Utah Oil Refining Company and necessarily curtail and obstruct the flow into interstate commerce of petroleum products manufactured by Standard. We think the Board was justified in finding that the unfair labor practices of Stanolind had a direct effect upon interstate commerce.[23]

23 See National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37–41, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 466–468, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 604–608, 59 S.Ct. 668, 83 L.Ed. 1014.

An Employees' Representation Plan [24] similar in essential respects to the Standard Plan was in operation in the Salt Creek Field in Midwest, Wyoming, from 1933 to May 3, 1937. On the latter date, Stanolind called a meeting of the Joint General Committee. [25] A letter signed by F. O. Prior, president of Stanolind, was read to the Joint Committee by Stanolind's Assistant Personnel Supervisor Eckwall. The letter was substantially the same as the letter of president Seubert referred to in the Standard case.

On April 28, 1937, C. S. Sanders, General Superintendent of Stanolind, in a letter to all District and Division Superintendents advised them that the Plan would be discontinued and cease to function on May 3, 1937; that Stanolind could not interfere with or have anything to do with any action the employees might take in forming an organization of their own, nor pay any expenses in connection with the formation or functioning of such an organization; that employees might meet to form an organization of their own but this could not be done on company time or pay; that it would be proper to let the employees have a meeting place if they desired so long as Stanolind was at no expense in doing so, and that Stanolind could also lend the employees ballot boxes for any election they might wish to hold, but that such election must be held on the employees' time; and that if the employees should form an organization and wished to meet the management to confer on matters of collective bargaining, this might be done on company time without loss of pay. It further directed the superintendents that should any employee wish to discuss matters with them, to make a record of any questions or comments for transmission to the Tulsa office of Stanolind.

On the same date, a letter of substantially the same tenor was issued by Personnel Supervisor Colvin to the Assistant Personnel Supervisors.

Following the reading of the Prior letter, the Joint Committee adjourned and groups of employees and representatives, including management representatives, formed and began to discuss whether they should form a new employees' organization and what character of organization should be formed. One witness estimated there were 56 employees and 4 management representatives present. Among the management representatives who took part in the discussion were assistant plant foreman Mercer, assistant water station manager Brunk, collection foreman Findley, and Kinion and Warner. Ensley, an employee at the gas plant, and an employee representative, and two other representatives started to leave the meeting and were called back by Mercer. Mercer stated that some kind of an organization would have to be formed for the purpose of collective bargaining with Stanolind; that the "boys" at Standard's Casper, Wyoming refinery had begun to form such an organization and that it might be a good plan to ascertain what they had done and possibly adopt some of their regulations or by-laws. Brunk stated he would ascertain the date of the next meeting of the Standard Association. Employee representative Ensley stated he saw no need for a new organization. Findley stated, "We had to have some way of bargaining with the management, and we should get some kind of an organization together to keep the C. I. O. out." A committee of six, including Mercer and Brunk, and employee representatives Ensley and Ziehlsdorff and employees Tilton and McClung, was selected to attend the meeting of Standard Association and ascertain what was being done by it. Mercer, Brunk, and other members of the committee attended the meeting of the Standard Association held on the night of May 4 and took back to Salt Creek copies of the Standard Association by-laws.

An organization committee, consisting of the employee representatives under the Plan, was created. Walter, a clerk in the personnel office, whose immediate superior was Eckwall, served as secretary of the committee. The committee met on May 5, 1937, and considered the drafting of a constitution for a Stanolind employees' organization. A rough draft was prepared by Walter and Ziehlsdorff, a clerk in Stanolind's main office, in charge of rentals and payroll. They had the Standard Association by-laws, a booklet describing the Plan, the agreement between the Chicago, Burlington & Quincy Railroad and its employees, and other material. The rough draft was presented to the organization committee at a meeting held on the night of May 8. Ten other employees were pres-

---

[24] Hereinafter called the Plan.

[25] Hereinafter called the Joint Committee.

ent on invitation from the committee. The group spent about three hours revising the draft prepared by Walter and Ziehlsdorff.

The constitution was presented at an open meeting held on the night of May 22, 1937. About 280 employees attended the meeting. The proposed constitution was taken up and considered section by section. One provision was referred to a committee for revision. Other provisions were amended. As revised, the constitution was adopted. Stanolind Employees Collective Bargaining Association [26] was adopted as the name of the organization. A motion was made and carried to proceed with the formation of an organization of employees. Application blanks were then circulated and signed by 56 employees.

The constitution states that the object of the Association is to provide a means by which representatives of the employees may confer with the management concerning wages, hours, employment, and working conditions. It provides for advancement according to seniority; that membership shall be open to all employees of Stanolind, except those having the power to employ, discharge, or discipline. It provides for an entrance fee of $1 and annual dues of $2, and that a member shall be delinquent who is in arrears on his dues for more than 60 days, and that only a member in good standing shall be entitled to vote. It provides for the election of a representation council and that the council immediately after its election shall meet and elect a chairman, vice-chairman, secretary, and treasurer. It provides that grievances of members shall be submitted to the council through a signed statement; that the chairman of the council shall then appoint a subcommittee of five members to investigate and determine the merits of the case; that the subcommittee shall make a complete and impartial investigation and a full report to the council, who shall determine the merits of the case by ballot; that if a majority of the council find the case to be worthy, the chairman of the council and members of the subcommittee shall take the matter up with the management; that if a satisfactory settlement is not arrived at through the local management, the matter will be referred to the management at Tulsa; and that if the foregoing procedure fails to effect a satisfactory settlement, the matter shall be referred to the National Labor Relations Board, whose decision shall be final, and that except as to such individual grievances, all major problems involving questions of wages, hours, employment, and working conditions shall be decided by a vote of all members.

It further provides that representatives shall be elected to the council semiannually from 13 voting districts designated in the constitution; that members in good standing shall be eligible to vote at such elections; and that representation shall be on the basis of one representative for each 30 members or major fraction thereof in each voting district, provided that no voting district shall have less than one representative. It provides an election procedure. It provides that all regular and special meetings of the council shall be open and may be attended by any member of the Association, and that regular meetings of the Association shall be held monthly at a regular date to be determined by the council. It provides that the constitution may be amended by a two-thirds vote of the council after the proposed amendment has been posted in each voting district for a period of 10 days prior to the meeting at which it is to be considered and ample opportunity given for discussion.

On June 11, 1937, a temporary council of 13 representatives, of whom six were former employee representatives under the Plan, was designated. On the same date, the temporary council met and elected a chairman, vice-chairman, secretary and treasurer. On June 14, 1937, the council appointed a committee to draft a working agreement to be presented to Stanolind. On August 21, 1937, the proposed working agreement was submitted to Stanolind with the statement that the Association had a bona fide membership of 216 and a request for a conference to discuss the working agreement. On October 15, 1937, Stanolind advised the Association that it could not enter into a bargaining agreement until the Association's membership embraced a majority of the employees. This condition the Association was never able to meet.

The organizational meeting of the Association on May 22, 1937, was held in a gymnasium under the jurisdiction of the school board, the use of which was obtained without charge by the employees from Stanolind's field superintendent. All

---

[26] Hereinafter referred to in the Stanolind case as the Association.

later meetings of the Association and of the Association's council were held with Stanolind's permission in buildings owned by it and furnished without charge. The constitution and membership petitions were written by Walter on machines owned by Stanolind. Stanolind's supervisory employees were consulted by members of the Association and gave advice on organizational matters such as the eligibility of certain groups of employees for membership in the Association.

While the five management representatives who took an active part in the preliminary conferences, with the exception of foreman Findley, had only minor supervisory authority, they were management representatives at the date of the dissolution of the Plan and had theretofore represented the management with respect to matters relating to wages, hours, and working conditions. Under the circumstances, it would be very natural for the employees to assume that the statements and acts of these management representatives with respect to the launching of the new organization expressed the views and desires of Stanolind. Although District Superintendent Hamilton became apprised of the activities of Findley and the other management representatives respecting the formation of an employees' organization and instructed supervisory employees to desist from such activities, Stanolind at no time took any other steps to dissipate the coercive effect of the activities of Findley and the other management representatives.

On April 16, 1937, Assistant Personnel Supervisor Eckwall began a series of weekly letters to Personnel Director Colvin, copies of which were sent to Division Manager Cullen and District Superintendent Hamilton. It appears from these letters and other correspondence and reports in the record not only that Eckwall was fully aware of all occurrences in the Association soon after they happened, but was apprised of intimate details respecting contemplated action. The weekly reports also reflected detailed knowledge by Eckwall respecting the internal affairs and activities of Local 233 of the Oil Workers International Union, a C. I. O. affiliate. Many reports which included no detailed account of the activities of the Local contained the statement, "There have been no reports this past week in regard to any C. I. O. activities in the Salt Creek Field."

The record contains no direct evidence revealing exactly how Eckwall obtained the information thus transmitted to his superiors. Eckwall testified that it came from anonymous letters, reports, and other papers which were left on his desk at irregular intervals over an extended period of time and denied that he maintained surveillance over or inquired into concerted activities of employees. There was also testimony that the employees frequently and openly discussed the affairs of the Association and the Local and that Eckwall could have overheard these conversations. None of the anonymous letters, reports, or papers referred to by Eckwall was produced at the hearing. He testified that they were in each case destroyed by him as soon as he read them. Davis, chairman of the council, testified he told Eckwall his plans on a number of occasions, though not always; that he knew Eckwall very intimately and that Eckwall was in the habit of visiting him in the field and eliciting from him information about the Association and its activities. Walter, the secretary-treasurer of the Association, also admitted that he discussed the affairs of the Association with Eckwall in a general way.

We are of the opinion that the foregoing facts afford a substantial basis for the finding of the Board that Stanolind dominated and interfered with the formation of the Association and contributed to its support and engaged in surveillance of labor organization activities in violation of § 8(1) and (2) of the Act.

The order as to Stanolind will be enforced.

The costs in the Stanolind case will be assessed against Stanolind.

### On Petition for Rehearing.

PER CURIAM:

No order having been made under Sectoin 9(d) of the National Labor Relations Act, 29 U.S.C.A. § 159(d), and no order having been made based in whole or in part upon facts certified, as a result of an investigation made by the Board pursuant to Section 9(c) of the Act, this court is without jurisdiction to review the propriety of the Board's designation of the appropriate bargaining unit in connection with its direction for an election for bargaining representatives to be held at an unspecified future date. National Labor Relations

Board v. Falk Corporation, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396; American Federation of Labor v. National Labor Relations Board, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347; National Labor Relations Board v. Inetrnational Brotherhood of Electrical Workers, 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354.

The other grounds of the petition for rehearing were fully disposed of in our prior opinion.

The petition for rehearing is denied.