## WILSON & CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.

## EMPLOYEES' REPRESENTATIVE COMMITTEE v. SAME.

### Nos. 3218, 3225.

Circuit Court of Appeals, Tenth Circuit.

July 8, 1946.

Rehearing Denied Sept. 13, 1946.

William L. Murphy, of Oklahoma City, Okl., and R. C. Winkler, of Chicago, Ill. (F. G. Anderson, of Oklahoma City, Okl., on the brief), for petitioners.

Reeves R. Hilton, Atty., N.L.R.B., of Washington, D. C., (David A. Morse, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Ida Klaus, Atty., N.L.R.B., all of Washington, D. C., on the brief), for respondent.

Before PHILLIPS and MURRAH, Circuit Judges, and KENNAMER, District Judge.

PHILLIPS, Circuit Judge.

These cases are here on petitions to review an order of the National Labor Relations Board.[1] Wilson and Co., Inc.,[2] is a Delaware corporation, and is engaged in operating meat packing plants in various states. Labor relations at its meat packing plant in Oklahoma City, Oklahoma, are here involved. The Employees' Representative Committee [3] is an independ-

---

[1] Hereinafter called the Board.
[2] Hereinafter called Wilson.

[3] Hereinafter called the E. R. C.

ent labor union, its membership being restricted to employees of Wilson's plant.

Upon an amended charge filed by United Packinghouse Workers of America,[4] an affiliate of the Congress of Industrial Organizations, and a charge filed by W. M. Blankenship, an employee of Wilson, the Board issued its complaint against Wilson, alleging it had engaged in unfair labor practices within the meaning of § 8(1), (2), (3), and (4) and § 2(6) and (7) of the National Labor Relations Act 29 U.S. C.A. §§ 158(1–4), 152(6, 7).[5]

At the hearing, the following facts were established by substantial evidence:

In 1920, there was formed, at the Oklahoma City plant, an independent union known as the Joint Representative Plan.[6] The Plan was operated in accordance with printed provisions issued by Wilson and distributed among its employees, and it provided for a "committee" composed of five elected employee representatives and an equal number of appointed management representatives. In September, 1935, after the passage of the Act, a meeting of both management and employee representatives of the Plan was held. A management official, whose identity is unknown, proposed the organization of E. R. C., and its organization followed. Since its formation, no general membership meetings have been held; Wilson has provided a meeting place, without charge, for E. R. C. representatives; meetings have been held during working hours, and representatives have been paid their regular wages for time thus spent; the secretary of E. R. C. has had the use of Wilson's mimeograph machine; and no dues have been assessed or collected. Since 1942, the E. R. C. has been allowed the commissions paid by a local company for the privilege of operating confection machines at the plant. Until 1942, non-supervisory employees at the plant were "automatically" members of E. R. C., no membership lists were kept and no membership cards issued, and E. R. C. had no constitution or by-laws.

Employee representatives of E. R. C. were elected in October, 1935. It has no management representatives. Its first chairman was William J. Lassiter. At one time he had been a management representative but, in 1934, he was elected as an employee representative. In 1936, Roy G. Decker became chairman. Thereafter, until the time of the hearing before the Board, he held that office, except for one year. Decker has been a watchman in Wilson's "Safety First Department" since about 1941, his sole and specific duty being to enforce Wilson's rules for fire prevention, "safety first," and sanitation.

During the latter part of 1942, when the Union became active at the plant, the question of membership cards and dues was brought up at an E. R. C. meeting. Representatives John B. Holmes and Preston Willrich testified that Superintendent A. M. Kellert advised the representatives that dues were unnecessary, and that they could get the "same thing" from E. R. C. that employees at a nearby Armour packing plant were "paying for" as members of the Union. Kellert testified that he did not remember whether he was present at that meeting. About the same time, Kellert informed the representatives that Wilson would deal only with a union that represented a majority of the employees. Chairman Decker called a meeting, and Louis B. Williams, although not a representative, was sent by his foreman to the office of Division Superintendent Tom Peacock, who sent him to the meeting. Decker gave Williams and the representatives E. R. C. application cards, told them he was "trying to head the C. I. O. off," and sent them back to their departments to get the cards signed. The signatures were obtained during working hours, and the representatives were paid regular wages for the time thus spent.

After employees' names were obtained, representatives informed M. R. Swanson, Wilson's Industrial Relations Manager, that they had about 1,100 memberships out of the 1,400 employees eligible for membership. A contract, recognizing E. R. C. as the exclusive "Bargaining Agency" for all production and maintenance employees at

---

[4] Hereinafter called the Union.
[5] Hereinafter called the Act.

[6] Hereinafter called the Plan.

the plant, was made between E. R. C. and Wilson on June 11, 1943, and such contract was in effect at the time of the hearing.

In February, 1944, employee W. M. Blankenship was summoned by Kellert and told that there were to be no "C. I. O. cards signed up on Wilson & Co's. premises." Foreman Clarence Jones also told Blankenship that he had been advised by a "good, responsible person" that if he "didn't cut out the Union talk," they would be "minus another man there." In April, Blankenship protested a change in his working hours, and Kellert said, "Don't come to me with things like that, the things you're a-doin'." Blankenship then appealed to an E. R. C. representative, who told him that he could not intercede for him unless he joined the E. R. C. and would "take an oath" that he would quit the Union and "have no more to do with it." After Blankenship had signed an E. R. C. card, he was restored to his former working hours.

Several witnesses testified that in 1933, the A. F. of L. became the bargaining agent for the employees, and that it called two strikes, one in 1934, and one in 1935, and that thereafter, the A. F. of L. abandoned the plant. The Trial Examiner made no finding on this point.

The Board found that Wilson, by long domination and interference with two successive labor organizations, its contribution of support to them, and the activities of its supervisory employees, had engaged in unfair labor practices within the meaning of the Act, and issued a cease and desist order.

After petitioners' brief was filed, but before the oral argument before this court, petitioners filed two motions to include additional evidence in the record. The first of these motions was concerned with an election held at Wilson's Oklahoma City Plant, on December 21, 1945, at which time the employees voted not to be represented by the Union. The petitioners' remedy for obtaining consideration of this evidence was to apply to this court for an order requiring the Board to receive and consider the additional evidence, and to file its recommendations, if any, for the modification or setting aside of its original order.[7] Since the petitioners have not applied for this relief, they are not entitled to have their first motion considered by this court.

The second motion was concerned with evidence of Wilson's conduct toward the Union at its other plants. This evidence was offered before the Trial Examiner, but was not admitted on the ground that it was immaterial. If this evidence were admitted and considered, it would not change the result here. Therefore, it is unnecessary to pass upon its admissibility.

Petitioners contend that the Board's order should be set aside because the collective bargaining agreement of June 11, 1943, was in force at the time the charge of W. M. Blankenship was filed on July 5, 1944. This contention is based on the rider attached to the Labor-Federal Security Appropriation Act of 1944, 57 Stat. 494, which provides:

"No part of the funds appropriated in this title shall be used in any way in connection with a complaint case arising over an agreement, or a renewal thereof, between management and labor which has been in existence for three months or longer without complaint being filed by an employee or employees of such plant. * * *"

Petitioners, however, fail to notice the proviso, which reads as follows:

"Provided further, That these limitations shall not apply to agreements with labor organizations formed in violation of section 158, paragraph 2, title 29, United States Code."

The Board found that § 158(2), Title 29, § 8(2) of the Act, had been violated. Hence, under the express provision of the proviso, the limitation does not apply. It has been held that the limitation is on the expenditure of money, and does not go to the jurisdiction of the Board. In National Labor Relations Board v. Thompson Products, 9 Cir., 141 F.2d 794, 798, the court said:

"The conclusion is unavoidable that a limitation on appropriations, not an alteration in the basic act, was contemplated."

---

[7] See 29 U.S.C.A. § 160(e).

However, we deem it unnecessary to decide that question.

■ The evidence shows that Wilson instigated the Plan in the early 1920's, and controlled it until October, 1935, after the passage of the Act, and that the Plan was in violation of the Act is not denied by petitioners. When an existing labor organization, unlawful because of employer domination, is succeeded by a new organization, there must be a clear line of cleavage between the old and the new. "The slate must be wiped clean."[8] Here, there was no clear line of cleavage between the Plan and E. R. C., and Wilson encouraged, supported, and discriminated in favor of E. R. C. The Board was warranted in finding that Wilson dominated E. R. C.

■ It is well settled, as petitioners contend, that the findings of the Board cannot stand unless supported by substantial evidence.[9] However, the weight of the evidence, the credibility of the witnesses, and the inferences reasonably to be drawn from the evidence are matters to be determined by the Board and not by the court.[10] In National Labor Relations Board v. Standard Oil Co., 10 Cir., 124 F.2d 895, 903, we said:

"Section 10(e) of the Act, 29 U.S.C.A. § 160(e), provides: 'The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' This 'means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." * * * It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' "

■ Considering these requirements, we are of the opinion that the evidence supports the Board's findings.

■ Petitioners contend that even if there were some basis for issuing a cease and desist order, the one issued here is too broad, because it orders Wilson to withdraw all recognition from, and completely disestablish E. R. C. But it is for the Board, not the courts, to determine how the effect of prior unfair labor practices may be expunged.[11]

The order will be enforced.

[8] Magnolia Petroleum Co. v. National Labor Relations Board, 10 Cir., 115 F. 2d 1007, 1011; National Labor Relations Board v. Moore-Lowry F. M. Co., 10 Cir., 122 F.2d 419, 424; National Labor Relations Board v. Continental Oil Co., 10 Cir., 121 F.2d 120, 123.

[9] Boeing Airplane Co. v. National Labor Relations Board, 10 Cir., 140 F.2d 423, 433; National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 59 S.Ct. 501, 83 L.Ed. 660; Ballston-Stillwater K. Co. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 760; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Standard Oil Co., 10 Cir., 124 F.2d 895, 903.

[10] Swift & Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87, 93; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368.

[11] International Ass'n of Machinists v. National Labor Relations Board, 311 U. S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396.