## NATIONAL LABOR RELATIONS BOARD v. GALLUP AMERICAN COAL CO.

### No. 2498.

Circuit Court of Appeals, Tenth Circuit.

Nov. 5, 1942.

Gerhard P. Van Arkel, Morris P. Glushien, Roman Beck, and Helen F. Humphrey, all of Washingon, D. C., on the brief), for petitioner.

Harris K. Lyle, of Gallup, N. M. (C. C. Parsons, of Salt Lake City, Utah, and J. F. Woodbury, of Silver City, N. M., on the brief), for respondent.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

The National Labor Relations Board found that the Gallup American Coal Company had violated Sections 8(1) and 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158, and that such practices affected commerce within the meaning of Sections 2(6) and 2(7) of the Act, 29 U.S.C.A. § 152. It issued a cease and desist order based on its findings, ordering the company to cease and desist from such practices, post appropriate notices, and offer reinstatement to six discharged employees and make them whole as to any financial loss suffered by their discharge. The company failed to comply with the order and the Board seeks enforcement thereof.

The strife between the company and the union dates from the inception of their dealings with each other. In 1917 the Victor American Fuel Company operated some mines near Gallup, New Mexico. It operated them under a contract with the union. In July of that year the mines were acquired by the Gallup American Coal Company. It did not adopt the contract with the union. As a result, a serious strike developed which engendered great bitterness. Gunmen were imported, strikers were forcibly ejected and physically deported from Gallup. From then on, the history of the company's relations with the union was antagonistic. Its operation of the mines was marked by numerous strikes, the last one coming as late as 1939, all of which were won by the company.

In 1934 the company posted a notice on the bulletin board evidencing its continuing opposition to unions or collective bargaining. New copies of the notice were posted in 1936 and 1939 and were maintained on the bulletin board until sometime in 1940. As far as pertinent here, the notice stated:

"The Company will not recognize any committee as representing either a group of its employees or its employees as a whole

Robert Todd McKinlay, of Washington, D. C. (Robert B. Watts, Ernest A. Gross,

unless all of the employees constituting such group or whole, and regardless of affiliation with any organization or society of employees or otherwise, have been afforded the right to participate in selecting such committee: nor will such committee be recognized as representing any employee or employees who do not wish to participate in such selection."

Numerous advertising signs were painted on large boulders on the company's property along the road from Gallup to the mines, including advertising by the union. No permission had been obtained by anyone for painting these signs. The company had a ball park surrounded by a fence. Advertising was also painted on this fence without permission, including some by an organizer for the union. A company official ordered the organizer for the union, who was an employee, to stop painting signs on company property because permission had not been obtained therefor. All of the signs on the ball park fence were removed, and all union signs on boulders on the company's property were removed. All other advertising signs on the boulders were permitted to remain, although no permission had been secured for them.

■■■■ The employees selected one of their number, who was a member of the union, as check weighmaster. His salary was paid by the employees. It was his duty to check the weights with the company weighmaster. Many arguments developed between him and the company's weighmaster. The superintendent of the company stated to him on different occasions that it was bad for him to fight so much because he would not be weighmaster all the time and that he would then be unable to get a job. After he ceased being weighmaster, he applied to the foreman for a job, but was told there was none for him because he had "raised too much hell." He then applied to the superintendent, who ordered him put to work, stating in the presence of another workman that it would probably be better to give him a job so he would keep his mouth shut and not go around trying to organize the men. Another employee who belonged to the union complained to his foreman of a decrease in pay. The foreman replied that in a short time the union would pay him his wages. About two months later he was discharged. From all of these facts and the surrounding circumstances and inferences to be drawn therefrom, the Board made its findings of

unfair labor practices. True, as in all these controversies, there was evidence which would support contrary findings and conclusions. But that was for the Board. It resolved the issue against the company. All of the facts and inferences deductible therefrom, including the long continued, openly expressed hostility of the company to unions and collective bargaining, continuing unbroken for years after the passage of the Act, support the findings of the Board, and we may therefore not set them aside.

Further complaint is made that the finding of the Board that the company violated Section 8(3) of the Act by discriminating against certain employees in a lay-off is not supported by the record. In the early part of 1939, due to a decrease in business, the company determined it was necessary to discharge a number of employees. It was determined that the discharge should be according to seniority; and that those with the least amount of seniority should be discharged first. The company had not maintained seniority records, so the superintendent directed the preparation of such a list, arranging the employees according to length of service. Complaint was made to the Board by eleven employees that they were discriminatorily discharged contrary to the adopted policy. After lengthy hearings, the Board absolved the company from unfair labor practices in the discharge of five of these employees. As to five of the remaining six, the Board found that their employment was discriminatorily terminated, and as to the remaining one, that the company discriminatorily refused to rehire him. Most of the employees who were discharged in violation of the seniority rule belonged to the union.

The employees involved are: Celso Esparza, George Burrola, James Anaya, Antonio T. Ponce, John Portley, and Lorenzo Hernandez. At least six men were retained who had less seniority than Esparza. His foreman, when notifying him of his discharge, stated that he was sorry, because he was producing more coal than some who were being retained. He had joined the union in January, 1939, and was active in soliciting members. While the company denied knowledge of his union activities, there was evidence that when he complained to his foreman about his pay, the foreman replied that it made no difference, because the union would be paying him in full shortly.

Burrola joined the union in January, 1938. He acted as interpreter for other locals of the union. He was the most active union member of all the discharged employees. Fourteen employees with less seniority were retained. Only two of these fourteen belonged to the union. Assistant General Manager Uhland admitted that he believed Burrola to be a union member.

Hernandez joined the union in 1939. He used his car for transporting members to union meetings and solicited members for the union, together with his brother-in-law, Burrola. Uhland denied knowing of his union affiliations. After he was discharged, there was need for additional nippers. Fellin, his foreman, wanted to put Hernandez back to work, but Superintendent Husband refused, telling ·Fellin to make nippers out of some men in the mine.

Anaya was an active union organizer and actively solicited members for the union. He was the only one of twelve motormen laid off. Three inside company men, one of whom was a motorman, all having less seniority than Anaya, were retained. Only four inside company men were involved in the April layoff. Of them, only one did not belong to the union, and he was rehired after only six months.

Ponce was granted a leave of absence to return to Old Mexico, without detriment to his seniority. Upon his return he made numerous applications for re-employment and was always told to come back. In the strike of 1939 he was out on the picket line. Thereafter, when he made application for work, he was told there was no reason for him to stick around because they were not going to hire any more men.

Portley also helped to organize the employees and took an active part in the affairs of the union. The reason given for his discharge was that his body odor was so offensive that no one would work with him. There was some corroboration of this, although the man who had been working ·next to him for some time made no complaint. In view of the further fact that he could have been employed in positions where he worked by himself, the Board refused to give credence to the company's explanation for his discharge.

▆ In some instances the explanation given by the company was that errors had been made; in others, that those with less seniority who were retained had dependents; and in a few instances, the only explanation offered was that some adequate reason must have existed for disregarding the seniority rule. When discrimination appears in the discharge of employees according to the method adopted for their discharge, it is no explanation to simply say that there must have been some reason therefor. It is to be noted that those employees who were discharged contrary to the seniority rule also had dependents depending upon them for support.

▆ The record in its entirety in the matter of these discharges presented a question of fact for the Board's determination. Its findings are supported by substantial evidence and may not be disturbed by us.

▆▆ It is charged that on account of the bias and prejudice of the trial examiner and the Board, the proceedings were a nullity and that the company was denied due process. A careful examination of the record fails to reveal anything justifying such a charge. Simply because the examiner and the Board failed to agree with the contentions of the company in every instance does not convict them of bad faith or arbitrary conduct. Their good faith in conducting the proceedings is further attested to by the fact that in five out of eleven charges they agreed with the company and absolved it of unfair labor practices.

The order of the Board will be enforced.