## BOEING AIRPLANE CO., WICHITA DIVISION, v. NATIONAL LABOR RELATIONS BOARD.

### No. 2681.

Circuit Court of Appeals, Tenth Circuit.

Jan. 17, 1944.

George Siefkin, of Wichita, Kan. (Robert C. Foulston, Samuel E. Bartlett, George B. Powers, and John F. Eberhardt, all of Wichita, Kan., and Chandler F. Jarvis, of Winfield, Kan., on the brief), for petitioner.

Charles F. McErlean, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, David Findling and Maurice R. Kraines, Attys., all with National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before, PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

By this proceeding, the Boeing Airplane Company, of Wichita, Kansas (herein called Boeing)[1] seeks reversal, and the National Labor Relations Board (herein called Board) seeks enforcement, of the Board's order which found that Boeing had engaged in unfair labor practices within the meaning of Sections 7 and 8(1) and (3) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq.[2] and ordered Boeing to cease and desist from such practices; to post the usual notices and to make whole certain of its employees whom the Board found had been discriminatorily discharged because of affiliation with and activities in behalf of labor organizations. The sole question here is whether there is any substantial evidence to support the order of the Board and a recital of the factual details is essential to a proper consideration of that question.

In March, 1938, and during the early history of the National Labor Relations Act Boeing requested and received advice from counsel concerning its duties and obligations under the Act. It was advised that any expression of its views to its employees concerning labor organization might be construed as an attempt to "coerce, interfere, influence or direct their activities".

Accordingly, on August 1, 1938, Boeing posted a notice on its bulletin board which, after quoting sections 7 and 8 of the National Labor Relations Act, advised the employees that the Company intended to live up to the spirit of the Act, which it interpreted to mean that each employee was to exercise his individual judgment regarding affiliation with labor organizations without any interference or domination of the employer, but the employees were admonished not to discuss labor organizations on company time or property. This notice remained on the bulletin board until March 28, 1940.

On April 2, 1940, the Company posted a notice to the effect that Boeing did not approve or adopt any of the unfair labor practices charged against its predecessor the Stearman Aircraft Company;[3] that Boeing guaranteed to each employee all rights under the National Labor Relations Act, again quoting sections 7 and 8 thereof. The notice reaffirmed Boeing's intention "to live up to the spirit as well as the letter of the National Labor Relations Act * * * every employee is free to join any Union of his choice and this company may not do anything to interfere with, restrain or coerce its employees in the exercise of this right". All supervisory employees were in-

[1] Formerly Stearman Aircraft Company. The name was changed to Boeing Airplane Company sometime in 1941, but no point is made of corporate entity or responsibility.

[2] Section 7 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Section 8 provides: "It shall be an unfair labor practice for an employer—
"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7. * * *
"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *."

[3] In March, 1940, the A. F. of L. filed charges with the Board which resulted in the posting of the notice of April 2, 1940.

structed to make no statement or take any action in conflict with this announced policy.

On January 17, 1941, the Boeing addressed an open letter to all the employees in which the history of the Company was traced and the future outlined in some detail, doubtlessly intended to promote friendly employer-employee relations. Inter alia it was stated that the Company was operating under the National Labor Relations Act; that membership in a labor union was not essential to a job with the Company, neither was it a hindrance.[4] All foremen and supervisory employees were "instructed and directed to abide strictly by the rules herein described and by the laws herein referred to * * *." The employees were urged to cooperate in carrying out the spirit and the letter of the notice and to that end it was suggested that the contents of the notice be freely and openly discussed between the management and employees. The letter further stated that it was not necessary to discuss labor organization "behind one's back". "The management is willing and anxious to discuss with any employee, singly or in groups any of the points herein set forth, or any other matter which may tend toward a closer employer-employee relationship and understanding. The intervention or interference of third parties for such purpose is unnecessary".

On March 13, 1941, Vice-President and General Manager, J. E. Schaefer, issued written instructions to all foremen and crew-chiefs in which he again cautioned them "to avoid every evidence of participation or prejudice in any unionization activities".[5]

Again on July 22, 1941, Schaefer caused to be posted on all bulletin boards in both plants another notice which referred to the letter of March 13, to the foremen and crew-chiefs (see Note 5) and quoted Sections 7 and 8 of the National Labor Relations Act. The crew-chiefs and foremen were "enjoined" to familiarize themselves with their obligations under the Act and "not to take any steps which will place the Company in an embarrassing light or in violation of the Act".

On or about this same date (July 22, 1941), approximately 6000 anti-union handbills were distributed to Boeing employees at the plant gates. The handbills, signed "We The Loyal Employees" were headed "There Is A Sucker Born Every Minute", and continued "evidently the Stearman employees who are the Stooges for the Labor Union Racketeers haven't forgotten what Barnum said, and now they are trying to revive the old Myth, * *" and closed by saying "If you are so in love with a Union why don't you quit here and go to work where they have one and stop bothering us who know when we are well off."

On July 29, 1941, the Company posted on all bulletin boards a statement expressly repudiating knowledge or responsibility for the handbills; reaffirming the right of employees to join any union they desired; stating that the Company could not and would not take any part therein, and whatever they did would not affect their employment in any manner; that the supervisory employees had been specifically instructed they must not violate the Company's policy in this regard, and anything done by a supervisory employee which attempted to give any different attitude of the Company other than that of strictest impartiality was unauthorized and forbidden. "Help the management maintain its impartial attitude. Help us also to keep our national defense job always ahead of schedule".

On the same date (July 29, 1941) Mr. Siefkin, Counsel for Boeing appeared before all supervisory employees for the purpose of interpreting the National Labor Relations Act and its application and effect upon the supervisory employees. Sections 7 and 8 of the Act were read and the supervisory employees were told that they had the absolute right to join or not join any Union, but that they were "spokesmen" for the Company and as such they had no right to do or say anything which might be con-

---

[4] The letter further stated:

"You are free to join or not join any church, lodge, political party, labor union or social organization of your own choice and your membership or non-membership in any such democratic organization will not influence your job in any way. These are rights flowing to every individual in our democracy and the management of this company will go along with you in preserving them in every possible way."

[5] The instructions continued: "Under prevailing law the officers of the Company, department heads, foremen and crew-chiefs are not permitted the privilege of advising or encouraging for or against any union. Employees' activities in this connection are not to be indirectly or directly interfered with so long as these activities do not take place on company time. * * *"

strued as influencing or interfering with the rights of the employees to form or join a union. Attention was called to the various notices which had been placed upon the bulletin boards from time to time and they were specifically admonished to observe the announced policy of the Company.[6]

On, or about August 2, 1941, several thousand more anti-union handbills were distributed to the Company's employees at the plant gates. These handbills were also signed "We The Loyal Employees" and contained many violent and scurrilous statements against the unions—"the gangsters who control American labor unions are the lowest creatures on earth * * *".

On, or about September 20, 1941, the employees were again flooded with anti-union handbills, headed "Fellow Employees" and signed "We The Loyal Employees". These handbills were distributed at the plant gates and contained another violent attack upon unions, union leaders and organizers.

In the latter part of September, 1941, the Company issued a printed slip which was attached to the paycheck of every employee and the handbook of every new employee. It called attention to the previous oral and written instructions concerning the attitude of management with regard to labor unions—"its attitude must be one of absolute impartiality". Foremen and crew-

chiefs were instructed to maintain a neutral attitude at all times on or off the job, and all employees were instructed not to engage in union activities on Company time or property and "any violation of this order is ground for immediate discharge". Apparently by way of reference to the anti-union handbills it was stated "name calling and the use of abusive language such as has been recently used, and which the management expressly repudiates is evidence of weakness and not of strength. It should not be resorted to. We have but one job to do—and it is a big one—we ask your sincere and intelligent cooperation."

On November 13, 1941, another lecture was conducted by Mr. Siefkin for all the supervisory employees. They were advised that charges of unlawful interference with union activities had been made by both the CIO and the A. F. of L. He reiterated the policy of the company as announced in its previous bulletins, letters and other open communications, and the employees were again admonished not to express any view whatsoever concerning labor unions or the rights of employees to join a union of their choice.[7]

On January 1, 1942, the Company addressed another open letter to all of its employees which in form and substance was similar to the open letter of January 17, 1941. It reviewed the course of operations

---

[6] In the course of his talk to the supervisory employees Mr. Siefkin left no doubt of his hostility to the National Labor Relations Board and those charged with the administration of the Act. In part he stated " * * * You may have read an article in the Saturday Evening Post entitled 'Amateur Jurists'. They have a bunch of youngsters out of Yale, Harvard, Columbia or some of the Eastern schools, who have never tried a lawsuit in their lives, and probably never have been in a courtroom and who know nothing about law. They take this examiner's report who heard the evidence, and they will go through the report and from it pick out a line here, or a sentence here and a word there, and from that they will find that the Company violated the Wagner Act and the Board signs it and from that they will find that the Company has violated the Wagner National Labor Relations Act and upon that the companies are penalized. Of course, I am against it. I am going to live long enough that I am going to get some of these lawyers in court —I am going to get one of these gov-

ernment attorneys in court where he will have to obey some rule of evidence— some rule of law and procedure without letting him run rampant. This of course, is purely a personal peeve of mine. The one thing which I am concerned with here is that you don't get the company in trouble doing something for or against unions. You shouldn't do it—you will have to stay out of it."

[7] In his discourse, Mr. Siefkin stated "I told you when I was here before that the Act was an unfair Act and that it gave the employers no rights and that its interpretations by the Board and by the Court was in many instances downright silly. I told you it was one-sided. Very recently I talked to a representative of the National Labor Relations Board and I made the complaint to him, the same as I have here, and he answered, in substance, 'Well, that's just the way we planned it, and what are you going to do about it?' To which my answer was 'nothing at all. We are going to obey the law to the letter so long as it is the law'."

during the past year, noted the tremendous growth of the Company, and again stated that it was operating under the National Labor Relations Act and that it had always been the Company's intention to comply with the provisions of the Act "in spirit and in practice". The employees were told that membership in a union was neither necessary nor a hindrance to employment with the Company, and that the Company would not act to influence, coerce or intimidate any employee concerning membership in any Union, or any other organization. After outlining the management's obligations, the employees were again admonished not to discuss labor union organizations during working hours or on company property. The employees were cautioned not to intimidate any other employee by "word, act or deed" with the idea of compelling him to join or not join a labor union. Attention was directed to the National defense job assigned to them and they were reminded that their cooperation was essential to the success of that task.

On, or about January 12, 1942, anti-union handbills were again distributed at the plant gates. As before they contained highly derogatory statements concerning unions and union leaders.[8]

An investigation by the National Labor Relations Board revealed that Assistant Foreman, Dave Reiswig, had originated the idea of printing and circulating the anti-union handbills, and that he had first discussed the matter with Harold Stancer, Assistant Manager of Plant No. 2. Reiswig wrote the material in longhand, and through Clem Kreuter, a sheet metal mechanic, arranged to have the handbills printed at a local print shop. Stancer, lead man Schauf (later crew-chief), and Crew-chief Parks, arranged to have certain farmers living nearby distribute the bills at the plant gates. Assistant Foreman, Tettenhorst, and Tool Superintendent, Babb, contributed substantial sums of money towards the expense of printing and circulation. On one occasion, Kreuter was instructed anonymously over the telephone to call at the Fourth National Bank. When he appeared, as instructed, he was given a cashier's check for $30 which he applied on the expense of printing and circulation of the handbills. When the entire matter had been exposed, those responsible for the printing and circulation were called to the office of Mr. Siefkin, who mildly reprimanded them, but according to Reiswig's testimony, Siefkin "sort of laughed about it". It is agreed that Seifkin had about 100 of the first edition of the handbills reprinted, 90 of which were in his office at the time of the hearing. In all, approximately 26,000 of the handbills were printed and about 16,000 were distributed on the four occasions. Those responsible for the printing and circulation of the handbills were not discharged but most of them were promoted in position and pay during the years of 1941 and 1942. They were veteran employees of the Company and their services were deemed essential to the rapidly expanding national defense program.[9]

---

[8] The handbill stated in part "we are now being solicited by two rival unions who are very much interested in our welfare and are offering cut rate prices of $3.00 entrance fee and $1.50 per month dues. Now by using some simple arithmetic it is easy to understand the motive of our would be benefactors. If we add $3.00 and $18.00 for dues and entrance fee, and multiply by six thousand employees, we arrive at the staggering figure of $126,000.00 per year. Boys, what gangster would not fight for so much dough".

[9] David Reiswig was first employed in 1928, as a welder. In November, 1937, he was made a crew-chief and promoted to Assistant Foreman in October, 1941. The number of employees under his supervision increased from 50 or 60 in July, 1941 to about 300 in June, 1942.

Thomas Babb was first employed in October, 1937. In August, 1940, he was promoted from Tool Crib Assistant to Tool Crib Foreman and in April, 1942, promoted to Tool Superintendent. The number of employees under his supervision increased from 60 in June, 1941, to approximately 3400 in June, 1942.

Ed Tettenhorst was first employed as a welder in October, 1938. In April, 1939, he was promoted to crew-chief; in July, 1941, he was made assistant foreman and in August, 1941, he was transferred to "Jig Makers".

Walter J. Schauf was first employed in March, 1941. He was promoted to lead man in November, 1941, and to crew-chief in January, 1942.

Harold M. Stancer was first employed in July, 1938; in April, 1941, he was made Dispatch Chief; in October, 1941, promoted to Foreman of production, and in June 1942, to Assistant Superintendent. The number of employees under his supervision increased from 90 in September, 1941 to between 230 and 260 in June, 1942.

On February 9, 1942, Siefkin addressed a letter to a field examiner for the National Labor Relations Board, in which he asserted that the Company had no part in, or knowledge of, the handbills, stating that the Company deplored the actions of the supervisory employees and that it was in direct violation of the Company rules. He stated that he was in the course of preparing another notice to the supervisory employees, which was to be posted upon the bulletin board, but had refrained from posting it pending a final decision under the "existing circumstances". It was suggested that "perhaps a notice from the management, given under the direction of the Board, might eliminate any probability of a recurrence of similar acts, and would be of assistance to the Company in maintaining a policy of absolute neutrality in labor matters". He welcomed the advice of the Board "in view of the present situation". A conference between Siefkin and the Regional Director followed, as a result of which the Regional Director agreed to prepare and submit an appropriate notice to be placed upon Boeing's bulletin board. A "stipulation of settlement" was submitted, which apparently was not in conformity with the understanding; Boeing refused to post it and no other notice purporting to repudiate the last handbills was posted. However, on March 26 and April 8, 1942, respectively, Siefkin conducted his usual lectures to the supervisory employees concerning their rights and duties under the National Labor Relations Act.[10]

The National Labor Relations Board filed this complaint May 23, 1942, and the matter came on regularly for hearing before a trial examiner.

According to the testimony of W. E. Keller, on or about January 20, 1941, Assistant Plant Engineer Steele accused him of discussing union organizations on company time and property, stating "I am not going to have any Union men in my department." On September 15 or 16, 1941, while Keller was in company with Plant Engineer Plagens and Steele, Plagens stated: "I wish there was open season on Union men" and Steele said "he would get his share if there was". Again on September 30, 1941, according to Keller's testimony, Steele stated "Pat [Keller] I have warned you and warned you, you will have to get out of that thing you belong to or else you are going to lose your job". On another occasion Keller overheard a conversation between Steele and Arden in which unprintable remarks were made concerning John L. Lewis. Local 935 of the UAW-CIO was organized about the 1st of September, 1941, and Keller became Vice-President the following October.[11] On February 12, 1942, Keller was discharged by Steele and Personnel Director, Trombold, for the stated reason "that he could not get along with his fellow workmen".

Homer Kelley, President of Local 935, UAW-CIO, a welder and lead man, testified that in February, 1942, his foreman Jordan told him he could not make him a crew-chief "on account of my affiliations" and in February, 1941, his Assistant Foreman Tettenhorst stated to him that "any man who would join a labor union should be shipped to Russia". In September, 1941, Maintenance Foreman Hill stated "Kelley we don't want any labor union in here at this time because working conditions are too good". Kelley was not discharged.

Dick Goss, a welder and a lead man, over eight other employees, testified that in March, 1942, Jordan, who was his foreman, told him that he had turned his name into the office for a crew-chief job "but according to Schaefer's memo you won't get it, but I turned it in any way". He further testified that he attended the supervisory employees' meetings where Mr. Siefkin admonished all supervisors not to engage in any union activities and that he told foreman Jordan he could not accept a crew-chief's job under those circumstances. Jordan replied he had recommended a raise but would have to withdraw the recommendation and the crew-chief's job. Goss was active in labor unions, but he was not discharged or otherwise disciplined.

Arthur Alexander went to work as a sweeper for Boeing in 1941, under Engineer Plagens and General Maintenance Foreman Steele. He joined the A. F. of L. in July and the UAW-CIO in August, 1941, and wore his union button on the job. He testified that in the latter part of August, 1941, he was told to report to Steele's office

[10] All of these so called "lectures" were stenographically reported and they are a part of this record.
[11] The trial examiner and the Board found that both the CIO and the A. F. of L. started membership drives in the plant in the early part of 1941, but the record does not clearly establish these facts.

where his crew-chief Jerry Hohe, handed him a rule book and told him to read it; that he told Hohe he had read the rules and abided by them. Foreman Steele, who was also present told him that he could get affidavits to the effect that he had discussed union matters on Company time and property and he answered he did not doubt it. Steele further told him that he had been given a five cent raise as of September 1, and that it was his last chance and stated that "if he had his way about it there wouldn't be no union in the plant". Alexander further testified that about a month later Steele reminded him of the raise and said "if I had any more difficulties not to go to these boys downtown, to talk to him, and we would iron it out". He testified that everyone knew he belonged to the Union and although warned by Steele about Union activities on the job he was raised from time to time until he was making 75 cents per hour at the time of the hearing.

Charles Cowan was employed by Boeing in September, 1939; worked one week in the maintenance department and was transferred to the stock room. He joined the UAW-CIO in October, 1941, and served as a member of the. Union's Executive Committee. He testified that about November 20, 1941, and five or six days before he was discharged, his foreman, Belden, said to him "Charlie, I want to compliment you on your work. * * * How would you like a raise? * * * Well, I put in for a nickel raise and it is already in effect", and then pointing to the Union button Cowan was wearing, said "we want you to play ball with us Charlie, you are a good man". He told Belden "if you are referring to this Union button you are pointing at, I still intend to wear this" and Belden said "I used to belong to a Union myself * * * but I can't talk no more". Cowan further testified that on or about December 16, 1941, assistant crew-chief Wells said to him "I am surprised. I see you are not wearing your union button, and I am glad to see that you have not joined up with a bunch of racketeers, and gangsters, and glad to see you get that button off." Schoeche, who was Cowan's crew-chief came around later in the day and apologized for the statement made by Wells, and asked Cowan to forget it. When Cowan was discharged for "Violation of Organization Rules", he was shown affidavits by other employees to the effect that he had engaged in union activities on the job, but he denied this by stating that the employees worried him to death talking to him about Union matters, and he always told them he was working and they would have to go to the Union for their information. Cowan was discharged in November, 1941.

Clyde Ellis went to work for Boeing in October, 1941, and worked under Foreman Jordan, and Assistant Foreman Reiswig. He joined the UAW-CIO in December, 1941. On May 9, 1942, he overheard a conversation between a jig builder by the name of Taylor and a welder by the name of Chase, wherein Taylor made pro-union statements and chase anti-union statements. Ellis testified that he was called to the office of the General Supervisor and asked to sign an affidavit against Taylor; when he refused to sign an affidavit against Taylor without signing one against Chase, he was told to just forget it.

Taylor testified concerning the verbal altercation between himself and Chase. He testified that following the altercation he was taken to the office of Mr. Schaefer by his foreman Schupp. Schaefer first told him that their conversation would be reported in shorthand and transcribed, and that a copy would be sent to him if he wished.[12] He then told him that he had an affidavit to the effect that he had made unprintable statements to a man because he would not join the Union. Taylor gave his version of the altercation and stated that Schaefer told him his work was satisfactory but reminded him of the company's policy with regard to discussing union matters on company time. The transcript of the conversation shows that Vice-President Schaefer addressed Taylor by his nickname "Red", called his attention to the publicized notices on the bulletin boards concerning the discussion of union matters during working hours, knowledge of which Taylor admitted. Schaefer then stated "now our position must be one of strict neutrality—we cannot take sides with the A. F. of L. or the CIO, but we can see, or do propose to see that the fight is kept just as clean as possible". Taylor's attention was called to the name calling affidavit but he denied making the statement "just that way". Schaefer stated that he did not want any name

<hr>

12 Thereafter Schaefer addressed a letter to Taylor, enclosing a transcript of their conversation, and expressed his gratitude for the opportunity of meeting and discussing the matter with Taylor.

calling "such as that, so that if it is necessary for us to face each other across the conference table we can do so without any hard feelings. We will not tolerate any solicitation for union membership during working hours. * * *".[13]

Marion Engel was employed in October, 1940, as a tool and die maker and later became crew-chief. His foreman was Jordan and his Assistant Foreman Reiswig. Engel joined the A. F. of L. November 6, 1941, and according to his testimony wore his union button at all times. On November 25, 1941, he was taken to the Personnel Office by Jordan and Reiswig, where Personnel Director James told him that "inasmuch as you are wearing a union button and attending meetings you are demoted from your crew-chief job and ten cents of your wages because the Company has the policy that no crew-chief may belong to the union and hold that job". Jordan inquired if there was a chance of Engel working back up to a crew-chief's job or a foreman's job and Supervisor McArthur said "yes, his work is very satisfactory and he is a good man", but James interposed "not as long as he is a union member". A day or two later Jordan informed him there would be "no union member a crew-chief on his work".[14]

Christian White was first employed by petitioner in October, 1941, and worked as a probationary employee,[15] under Foreman Jordan, Assistant Foreman Reiswig and Crew-chief Engel. He became affiliated

with the A. F. of L. on November 1, 1941. He testified that on November 26, 1941, in an interview with Jordan he was informed work was slow and asked if he would like to quit instead of being laid off by regular procedure. When he refused to quit, Jordan produced a report signed by Marion Engel and John Simpson which stated that his (White's) work had been unsatisfactory and had to be reworked. Jordan instructed White to go to the office of the Personnel Manager, James; when James told him that he understood his work was unsatisfactory White stated that Simpson had been forced to sign the statement about his work. James said "Well, we will have to investigate this," left the office for about ten minutes and upon return told White that Simpson denied having been forced to sign the statement. White further testified that all during the interview Jordan kept looking at his union button which he wore on the job.

Lela Roach was first employed by Boeing from September, 1938 until September, 1939, and was rehired in April, 1939. Sometime thereafter she was promoted to crew-chief. On the 17th of November, 1941, she was directed by her foreman to report to the office of Ira Smith in the Personnel Department, and according to a stenographically reported transcript of the conversation between them, Smith told her that he had definite proof she had been discussing union matters on company time and

---

[13] The transcript of the conversation continued:

"Mr. Schaefer: You will find that our policy has been and is one of fairness to all but there are certain rules that we must all abide by, and these have been put on the bulletin boards.

"Mr. Taylor: I know you have put it out on the board.

"Mr. Schaefer: Let's try and stay by it. I would appreciate it if you would just not give any opinion to the boys who are interested in the A. F. of L., the CIO, or no union at all. Let's all of us keep our damned mouth shut and build airplanes.

"Mr. Taylor: Has there been any remarks concerning my work?

"Mr. Schaefer: No, your work is satisfactory. I am afraid that if you were saying such things that it might get out of hand and I just wanted to stop it now. I don't want Divine, or the CIO people, or the A. F. of L. people to put charges against us that we are out of line. I don't want the men in the plant who are

not interested in either union to be bothered with any membership solicitation. I have to rely on you boys and thank God we still have a free country and I will go the limit with you in protecting your rights but to express those rights under the law—you must do it off company property.

* * * * *

"Mr. Schaefer: Keep that in mind and I want the campaign on all sides to be conducted in an orderly manner without any name-calling or disorder—after all, if we don't we haven't gained anything. We have been living without unions, with A. F. of L., CIO and independent unions, and I think we can go any way you want to go."

[14] Engel testified that he was offered a crew-chief's job four months after he was demoted but he refused the promotion because he was taking an active part in the A. F. of L.

[15] Some employees were placed on a thirty day probationary period before being given permanent employment.

that although the rule did not deprive her of the right to affiliate with a labor organization, it did deprive supervisory employees from talking for or about labor organizations while on or off the job. Roach denied discussing labor organizations while on the job, but did state that she had discussed labor matters at noon hours, and that the Company could not tell her what to do with her own time. She admitted that when she joined the Union on October 31, 1941, she took Lela Melton, who worked under her, to the union meeting and that Melton joined the union on that date. She also admitted that on one occasion she displayed her union button to an employee under her supervision. She was discharged on November 17, 1941, for "Misconduct relative to NLRB."

In September or October, 1941, Wayne Chastain, a foreman, made favorable comment concerning one of the anti-union handbills to a group of student employees under his supervision. Upon complaint by union representatives Schaefer told Chastain that "if he wanted to take sides he had to forego any position as a supervisor and go back to a position of an employee." According to Schaefer he was demoted "so that he could exercise the position that he seemed to want to exercise with respect to an expression of his opinions on labor issues." After about two months in a non-supervisory capacity, and after his promise to abide by the rules, he was restored to the position in the press and break department "because of the extreme need for supervisors in that Department."

From these facts, and the inferences which it drew therefrom, the Board concluded that Boeing had interfered with, restrained, and coerced its employees in the exercise of collective bargaining rights guaranteed by Sections 7 and 8(1) of the National Labor Relations Act. This conclusion is based in part upon a statement contained in the open letter of January 17, 1941, addressed to the employees wherein Schaefer concluded by stating in effect that it was not necessary to discuss labor organization "behind one's back"; that the management was ready and willing to discuss with any of the employees "singly or in groups" any points contained in the letter, or any other matter tending toward a closer employer-employee relationship; that the "intervention or interference of third persons is unnecessary." The trial examiner found no offense in the statements, and

so recommended, but the Board thought that when considered with the statement of Assistant Plant Manager Steele to the effect that if the employees had any more difficulty "not to go to those boys downtown, to talk to him," indicated Boeing's preference to discuss labor grievances with its employees directly rather than with a collective bargaining representative, and consequently the statement was evidence of an interference with the right to freely choose its collective bargaining representative.

The Board further found that the anti-union statements attributed to Plant Engineer Steele, Assistant Foreman Tettenhorst, Supervisory Inspector Wells, Plant Engineer Plagens, and Maintenance Superintendent Robert Hill, were made in accordance with the testimony of the Board's witnesses, and that the said statements tended to interfere with, restrain, and coerce the employees in the exercise of their rights to form, join, or assist labor organizations, and to bargain collectively through their chosen representatives. The Board further concluded that the coercive effect of the anti-union handbills distributed by supervisory employees at the plant gates, was not fully dissipated by the Company, since although by notices posted on its bulletin boards, and by letter attached to employee's paychecks, and handbooks it had "expressly repudiated" knowledge or responsibility for the July, August, and September editions, yet it did not take any steps to exculpate itself from the effects of the January, 1942, edition. The Board also took into consideration the Company's attitude or treatment of the supervisory employees responsible for the distribution of the handbills, after their identity had been exposed by an investigation by the Board. It was impressed by the absence of reprimand, censor, or discipline of these employees for their "flagrant violation of the respondent's union neutrality rule." The Board emphasized the attitude of the Company's attorney, who "sort of laughed about it," and noted that all of these employees had been subsequently promoted and their pay increased. And, especially did the Board lend significance to the disparity of the treatment accorded employees who violated the Company's rule on the union side, and the supervisory employees who violated the Company's rule on the anti-union side.

The trial examiner found no fault with the Company's rule which forbade supervi-

sory employees from engaging in union activities, either on or off the premises, and expressed the view that the primary purpose of the rule was to insure the non-supervisory employees the rights to collective bargaining, guaranteed by the Act. Rather, the trial examiner thought that the unfair practices resulted from a "discriminatory application of a non-discriminatory rule." But the Board found it unnecessary to pass upon the reasonableness of the company's neutrality rule, since it was convinced that Engel was demoted, and Roach, Cowan, Keller and White discharged because of their union affiliation and activities, and not because they violated any particular rule of respondent relating to union activities, on or off company time and property. On this basis, the Board concluded that Boeing had discriminated in regard to hire and tenure of its employees. This finding is its justification for the order of reinstatement and restitution.

■ In the determination of the question whether the order of the Board "is supported by the evidence" within the meaning of the National Labor Relations Act, 29 U.S.C.A. § 160(f) we must not forget that the Board is an expert administrative agency charged with the administration of the Act. To that end, it has the exclusive province of appraising conflicting and circumstantial evidence, the weight and credibility of testimony and of drawing inferences from established facts. National Labor Relations Board v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704; International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S. Ct. 344, 86 L.Ed. 348; National Labor Relations Board v. Nevada Consol. Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305; Magnolia Petroleum Co. v. National Labor Relations Board, 10 Cir., 115 F.2d 1007; Continental Oil Co. v. National Labor Relations Board, 10 Cir., 113 F.2d 473; National Labor Relations Board v. Moore-Lowery Mills Co., 10 Cir., 122 F.2d 419; National Labor Relations Board v. Denver Tent & Awning Co., 10 Cir., 138 F.2d 410; Harp v. National Labor Relations Board, 4 Cir., 138 F.2d 546; Utah Copper Co. v. National Labor Relations Board, 10 Cir.,

139 F.2d 788. "We must ever guard against allowing our views to be substituted for those of the agency which Congress has created to administer the Act." National Labor Relations Board v. Virginia Electric & Power Co., supra [314 U.S. 469, 62 S.Ct. 348, 86 L.Ed. 348]. There are, however, certain fundamental standards which the Board is required to observe in the effectuation of the legislative purpose, one of which is the traditional rule against the presumption of liability or bad faith. Another is the requirement that the evidence relied upon to support the findings of the Board must be substantial—not a mere scintilla, and the inferences drawn must be reasonable inferences generated by facts—not surmise and speculation. Consolidated Edison v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 59 S.Ct. 501, 83 L.Ed. 660; National Labor Relations Board v. Standard Oil Co., 10 Cir., 124 F.2d 895; Harp v. National Labor Relations Board, supra, and Utah Copper Co. v. National Labor Relations Board, supra.

■ It follows therefore that the mere filing of charges by an aggrieved party, or a complaint by the Board (Sec. 160(b) creates no presumption of unfair labor practices under the Act, but it is incumbent upon the one alleging violation of the Act to prove the charges by a fair preponderance of all the evidence, and the conduct of the petitioner is to be judged by this test.

Unlike the general pattern of cases coming up for review on the question of the sufficiency of evidence, there is no background of union hostility in the policy of the company, or any so called "inside or independent union" to claim the affection or preference of the company. Cf. Du Pont v. National Labor Relations Board, 4 Cir., 116 F.2d 388; National Labor Relations Board v. Keystone Freight Lines, 10 Cir., 126 F.2d 414; Magnolia Petroleum Co. v. National Labor Relations Board, supra, and National Labor Relations Board v. Gallup American Coal Co., 10 Cir., 131 F.2d 665. But by notices on the bulletin board, by open letters to all its employees and by oral and written instructions to its supervisory employees the company declared its intention to live up to the spirit as well as the letter of the National Labor Relations Act, which it interpreted to mean that every

employee was free to join any union of his choice without interference with, restraint or coercion by the employer in the exercise of that right. All employees were requested to cooperate in the effectuation of this policy by company rule, which forbade the supervisory employees from engaging in any union activities at any time, any where, under circumstances which might be construed to represent the attitude or the policy of the Company. The rule also prohibited all employees from engaging in union activities on company time or property, and stated that violation of the rule would be grounds for "immediate discharge."

■ The Board's conclusion of unfair labor practices is founded on a course of conduct evidenced in part by statements in the open letter of January 17, 1941. Like the trial examiner, we can find nothing in the letter from which an illegal preference to bargain individually can be inferred. In our judgment it simply is not susceptible of that interpretation.[16] The Company cannot, however, comply with the Act by mere "lip service"; its actions must be consistent with its word and its course of conduct will be judged not only by what it says, but what it does. See National Labor Relations Board v. Virginia Electric & Power Co., supra, 314 U.S. at page 478, 62 S.Ct. at page 349, 86 L.Ed. 348. Boeing has unequivocally proclaimed its good faith and honest intention and if its actions belie its word, it stands convicted of unmitigated bad faith and deliberate hypocrisy.

■ The record discloses that during the year 1941, out of approximately one thousand supervisory employees seven of them made eight or nine anti-union statements to union employees. The plant personnel was rapidly expanding to meet a tremendous national defense schedule of airplane production, and these statements were made in direct violation of positive instructions of the company to maintain a neutral attitude at all times. Each of the employees to whom the statements were made testified that they were familiar with the company's policy and they were not influenced by the statements. Whether the particular

employees to whom the statements were made were influenced or restrained is, of course, not necessarily the test of unfair labor practices, but it is pertinent to consider whether the anti-union statements were made in a setting, or circumstances, which may fairly be said to be symptomatic of an existent condition and whether the statements had a general, rather than a specific effect. Cf. National Labor Relations Board v. Link-Belt Co., supra.

■ The employer is not responsible for the conduct of its supervisory employees on the strict theory of agency or respondeat superior, but on the broader premise that the employer may be given an unlawful advantage in the collective bargaining process because the anti-union statements or conduct is in aid or furtherance of the employer's known attitude or policy. H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309.[17] If these statements, although isolated and subtle, when considered in connection with other circumstances, indicate a course of conduct which may fairly be said to represent the attitude of the company, such statements may be the basis for a finding of unfair labor practices. Virginia Electric & Power Co. v. National Labor Relations Board, supra, and Utah Copper Co. v. National Labor Relations Board, supra. We are not, however dealing with a case of affirmative or quiescent hostility. A course of conduct cannot be judged by a rule of thumb, each case must rest upon its particular facts and background. When judged in the setting and against the background in which these statements were made, we are of the opinion that the Company cannot fairly be responsible therefor. In our judgment they do not tend to establish a course of conduct by the Company which was intended to interfere with, restrain, or coerce the employees in the exercise of their rights guaranteed by the National Labor Relations Act, and the inferences which the Board drew are wholly unjustified.

■ The anti-union handbills distributed at the Company's gates were scurrilous

---

[16] Compare published notices and speeches to supervisory employees in National Labor Relations Board v. Virginia Electric & Power Co., supra.

[17] Following National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F. 2d 951, 956, this court held in Swift &

Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87, 93, that the doctrine of respondeat superior applied to the statements and conduct of supervisory employees, but the Supreme Court in the Heinz case apparently places the responsibility of the employer upon a broader ground.

and highly prejudicial, but no one knew until February, 1942, who was responsible for their printing and distribution. The Board thought because Boeing took no affirmative steps to dissipate the effects of the last edition and because of its lenient attitude toward the supervisory employees responsible therefor, it thereby engaged in unfair labor practices. In our opinion, the conclusions which the Board drew are not justified by the established facts. Boeing expressly repudiated knowledge or responsibility for all the handbills except the last edition. In that respect it asked the Regional Office of the National Labor Relations Board to prepare an appropriate notice which the Board agreed to do, but instead submitted a "stipulation and settlement," which included matters not within the contemplation of the parties. The Board did not recommend any disciplinary action for the supervisory employees responsible for the distribution of the handbills. The Board does not contend that they should have been discharged, but rather points to the disparity of treatment accorded them and the treatment accorded employees engaged in pro-union activities and this brings us to the question of discriminatory discharges.

Four employees, one of them a supervisory employee, were discharged, and one supervisory employee was demoted because they engaged in union activities on company time and property in violation of the company rule. We have recently held that the act does not "proscribe the right of an employer to forbid by rule or regulation, solicitation on its property and its discharge of an employee for violation thereof, provided the rule or regulation is promulgated in good faith and bears some reasonable relation to the efficient operation of the plant or business and is not merely a device to obstruct or impede self-organization." Denver Tent & Awning Co. v. National Labor Relations Board, supra. See, also, Harp v. National Labor Relations Board, supra; Midland Steel Products Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 800, and National Labor Relations Board v. Williamson-Dickie Mfg. Co., 5 Cir., 130 F.2d 260. The Board concluded, however, that these employees were discharged because of their union affiliation and activities and not because of the violation of the rule against union solicitation and activities on company time and property. It bases its conclusions primarily upon the disparity of treatment accorded those engaged in pro-union activities and those engaged in anti-union activities. Noteworthy of which is its interpretation placed upon the so called "Taylor-Chase incident," in which Taylor, who was alleged to have made pro-union statements was reprimanded and Chase who made anti-union statements was not. There is nothing in the interview between Taylor, as an employee, and Schaefer, as General Manager of the Company, from which it can be inferred that Taylor was intimidated or that he was discouraged in his right to union affiliation and activities so long as he did not violate the Company rule. Neither does the transcribed record of the conversation offer a basis for the conclusion that the Company "marshaled its forces" against the Union or union activities. We have heretofore painstakingly outlined the facts and circumstances under which each of these employees were discharged and demoted, either for pro-union activity or anti-union activity, and there is nothing in the record to indicate, or from which it can be fairly inferred that the rule against union solicitation or activity on company time or property was not promulgated in good faith, and that it did not bear some reasonable relation to the efficient operation of the plant. It is significant to note that out of approximately one hundred affiliated union members, about 15 were supervisory employees (crew-chiefs), none of which were discharged or molested for their union affiliation. When the conduct of Boeing is judged against the background of its announced attitude and policy, it cannot be held to have discriminated in the hire and tenure of its employees, and from the whole record we are convinced that Boeing has not engaged in a course of conduct which can be construed as an interference with, restraint or coercion of its employees in the exercise of their collective bargaining rights under Section 7 of the Act.

The order of the Board is reversed and enforcement denied.